***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence. Accordingly, the Full Commission modifies the Opinion and Award of Deputy Commissioner Harris and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing or after the hearing before the Deputy Commissioner, and/or in the executed Pre-Trial Agreement, as:
 STIPULATIONS *Page 2 
1. The parties are subject to the North Carolina Workers' Compensation Act, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter.
2. An employee-employer relationship existed between Plaintiff and Defendant-Employer.
3. The Phoenix Insurance Company is the carrier on the risk in this claim.
4. There is no issue as to misjoinder or nonjoinder of parties.
5. Plaintiff's average weekly wage in this claim is $367.20 per week.
6. Plaintiff sustained an injury on or about August 26, 2008.
7. Plaintiff's right knee condition arose out of and in the course of employment and is compensable.
8. Temporary total disability ("TTD") compensation was paid from September 4, 2008 through October 31, 2008, for a total of $1,993.45.
9. Plaintiff has received $18,646.12 in medical compensation.
On August 26, 2010, Deputy Commissioner Harris entered an Order admitting into evidence the following post-hearing Stipulations entered into by the parties on August 26, 2010:
1. Plaintiff received $2766.24 in short-term disability payments from Employer-Defendant. The short-term disability payments Plaintiff received were 100% funded by Employer-Defendant.
2. The chart below is an accurate record of Plaintiff's days worked, time missed from work, temporary total disability and short-term disability payments received during the time she was out of work after her August 26, 2008 motor vehicle accident:
DATES WORK PAYMENT AMOUNT OF STIPULATED
 STATUS RECEIVED TTD/STD EXHIBIT
 RECEIVED
9/4/08-10/29/08 Out of work TTD $1,993.45 for No. 9, p. 162
 time period of
 9/4/08-10/31/08
 *Page 3 
10/30/08- Worked Wages n/a n/a
11/14/08
11/15/08- Out of work for STD $1,346.40 for No. 11, p. 100
12/14/08 DVT time period of
 11/17/08-
 12/15/08
12/15/08- Worked Wages n/a n/a
12/31/08
1/1/09-6/9/09 Worked Wages n/a n/a
6/10/09-8/9/09 Out of work for STD $1,419.84 for No. 11, p. 101
 "white outs" time period of
 6/10/09-7/12/09
8/10/09-9/27/09 Worked Wages n/a n/a

 *********** EXHIBITS
The following documents were accepted into evidence by the Deputy Commissioner as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Industrial Commission Forms
 • Exhibit 3: Accident report dated 8/26/08
 • Exhibit 4: Correspondence
 • Exhibit 5: Job description
 • Exhibit 6: Plaintiff's discovery responses
 • Exhibit 7: Plaintiff's medical records
 • Exhibit 8: Termination documentation
 • Exhibit 9: Indemnity payment history
 • Exhibit 10: Medical payment history
 • Exhibit 11: Employment records *Page 4 
 • Exhibit 12: Unemployment benefits payment history
 • Exhibit 13: Job search logs
 • Exhibit 14: Accident report dated 1/21/10
Transcripts of the depositions of the following were also received following the hearing before the Deputy Commissioner:
 • Dr. John Maggiore (with Exhibit 1)
 • Dr. Dale A. Menard, Jr. (with Exhibits 1 2)
 • Dr. Mary Ann Knovich (with Exhibits 1-3; Plaintiff's Exhibits 1 2, and; Defendants' Exhibits 1 2)
 • Dr. Cormac A. O'Donovan (with Exhibit 1)
 • Dr. Thomas Gualtieri (with Defendants' Exhibits 1-3)
 *********** ISSUES
1. Whether Plaintiff's blood clots are compensable?
2. Whether Plaintiff's headaches and related symptoms are compensable?
3. Whether Plaintiff constructively refused suitable employment?
4. Whether Plaintiff remains disabled?
5. To what further compensation, if any, is Plaintiff entitled?
6. Whether Plaintiff is entitled to a suspension of the limitations period of N.C. Gen. Stat. § 97-25.1 for any of her medical treatment?
7. To what credit(s), if any, are Defendants entitled?
 *********** *Page 5 
Based upon all of the competent credible evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff is 41 years old, with a date of birth of November 8, 1969. She graduated from high school in Maryland in 1987 and completed two years of nursing school.
2. Plaintiff started working for Defendant-Employer, a daily newspaper, in October 2007. At the time of her injury in this claim, she was District Manager of Circulation. In that capacity, Plaintiff oversaw the paper carriers, sellers and newspaper racks. Plaintiff's job involved lifting bundles of newspapers, walking, and at least four hours of driving per day. Plaintiff typically spent one to two hours of her eight hour work day in the office.
3. On August 26, 2008, at approximately 1:00 p.m., Plaintiff was driving as part of her job when her vehicle went off the road during a cloudburst. Plaintiff's vehicle struck a large tree while traveling at a speed of approximately 20 miles per hour. Plaintiff was wearing a lap belt but no chest belt. The collision threw Plaintiff forward forcefully, but the vehicle's airbag did not deploy.
4. Plaintiff sustained injuries to her right knee and ankle as a result of jamming her right foot on the brake. She also either hit her head on the steering wheel or underwent an abrupt and significant deceleration. The emergency room note from the date of the accident reflects that Plaintiff complained of jaw pain but that she reported no loss of consciousness, dizziness, visual changes or vomiting.
5. Defendants accepted "a contusion to the chin and right knee" as compensable via a Form 60 dated November 13, 2008. *Page 6 
6. On September 4, 2008, Plaintiff presented to Dr. John Maggiore, her primary care provider, with pain in her right foot and pain and swelling in her right calf. Dr. Maggiore suspected, based on superficial phlebitis that he diagnosed in Plaintiff's right leg, that Plaintiff might have a blood clot. Superficial phlebitis is inflammation of a vein, and, as Dr. Maggiore testified, it is not uncommon after a knee injury.
7. Plaintiff told Dr. Maggiore on September 4, 2008 that she had bumped her head in the accident and that, to the best of her recollection, she had been dazed but not knocked out. Dr. Maggiore noted, based on Plaintiff's history, that it was "questionable whether she had a little concussion" in the accident.
8. Plaintiff continued to have pain and swelling in her right leg after the accident, which Dr. Maggiore documented in follow-up visits during September 2008. On September 22, 2008, a venous Doppler test revealed that Plaintiff had a deep vein thrombosis ("DVT"), or blood clot, in her right leg.
9. Although he stated that he could not give an opinion to a reasonable degree of medical certainty whether Plaintiff's motor vehicle accident caused her to develop DVT, Dr. Maggiore testified that there was "a very strong connection" between the accident and Plaintiff's DVT.
10. On October 21, 2008, Dr. Maggiore diagnosed Plaintiff with post-concussion headaches based on Plaintiff's complaint of continuing headaches since the accident. Dr. Maggiore felt that Plaintiff had probably sustained a moderate concussion in the accident. Dr. Maggiore has followed Plaintiff since 2005, and he noted that Plaintiff did not have a history of severe headaches prior to the accident. *Page 7 
11. After the accident, Plaintiff also suffered from spells that she characterized as "whiteouts," which Plaintiff described as a type of seizure where everything would go white like a fluorescent light bulb in front of her eyes, as well as vision and memory problems. Plaintiff did not experience any of these problems prior to the accident.
12. Due to Plaintiff's headache complaints, Dr. Maggiore referred Plaintiff to the practice of Dr. Dale A. Menard, Jr., a neurologist. Plaintiff first presented to Dr. Menard's practice on April 15, 2009 and complained of migraine-like symptoms, which Dr. Menard confirmed are typical of post-concussive-type headaches. Following diagnostic testing, Plaintiff was diagnosed with post-traumatic, post-concussive headaches. Plaintiff was prescribed Topomax, which reduced the frequency, but not the severity, of her headaches.
13. Plaintiff was eventually referred to Dr. Cormac A. O'Donovan, a neurophysiologist, for consultation regarding her "whiteout" spells. Diagnostic testing ruled out stroke, tumor and brain abnormalities, and Dr. O'Donovan did not believe that Plaintiff's spells were epileptic seizures. He could not come up with a definitive diagnosis for the spells.
14. Between the date of her work-related accident and the date of the hearing before the Deputy Commissioner, Plaintiff was hospitalized three times for right leg DVTs and/or related pulmonary emboli: September 22-28, 2008 and November 17-24, 2008 at Caldwell Memorial Hospital, and; January 9-11, 2010 at North Carolina Baptist Hospital.
15. During the first hospitalization, it was discovered that Plaintiff has Factor V Leiden heterozygosity, a hereditary condition that places the carrier at an increased risk for the development of blood clots. However, Plaintiff had had no history of blood clots, DVTs or known circulation problems prior to the August 26, 2008 accident. *Page 8 
16. Plaintiff was eventually referred to Dr. Mary A. Knovich, a hematologist, for her recommendations regarding Plaintiff's recurring pulmonary embolus and anticoagulation. Dr. Knovich recommended that Plaintiff receive anti-coagulant medication indefinitely, which Dr. Knovich stated meant probably for the rest of Plaintiff's life. Plaintiff is now on a regimen of blood-thinners, such as Coumadin.
17. Immediately after the accident, Plaintiff returned to work for Defendant-Employer for a brief time, and then went out of work due to her compensable injuries from September 4, 2008 through October 29, 2008. As noted in the Stipulations, Defendants paid Plaintiff temporary total disability compensation for the period from September 4, 2008 through October 31, 2008, meaning that they overpaid Plaintiff by two days' worth of temporary total disability compensation.
18. Plaintiff returned to work for Defendant-Employer in her pre-injury job from October 30, 2008 through November 14, 2008, and then went out of work again from November 15, 2008 through December 14, 2008 due to her second hospitalization for DVT. Plaintiff received short-term disability benefits totaling $1,346.40 for the period from November 17, 2008 until December 15, 2008 from a short-term disability plan that was fully funded by Defendant-Employer.
19. Plaintiff returned to work for Defendant-Employer from December 15, 2008 through June 9, 2009, then went out of work again from June 10, 2009 through August 9, 2009 because of her "whiteout" spells. Plaintiff again received short-term disability benefits totaling $1,419.84 for the period from June 10, 2009 through July 12, 2009. *Page 9 
20. Plaintiff then returned to work for Defendant-Employer from August 10, 2009 through February 22, 2010, with the exception of her absence due to her third hospitalization for DVT from January 9 through January 11, 2010.
21. On February 22, 2010, Plaintiff was notified, in a letter from Terese Almquist, Defendant-Employer's publisher, that she no longer qualified as "an eligible driver on company business" based on a motor vehicle record check dated February 16, 2010.
22. The driving record lists two accidents, one on January 31, 2008, and the other on August 26, 2008. A "prayer for judgment continued" is noted for the August 26, 2008 accident. Two violations are also listed on the record, one on August 26, 2008 for "exceed [sic] safe speed," and one on December 4, 2007 for "improper equipment-speedometer."
23. Plaintiff testified that the January 31, 2008 accident was a "fender bender" in which another driver hit her, and she was not at fault. The driving record does not indicate any violations associated with the January 31, 2008 accident.
24. The parties stipulated to an accident report dated January 21, 2010, which documented an accident in which Plaintiff was rear-ended and was clearly not at fault.
25. Ms. Almquist's February 22, 2010 letter gave Plaintiff until March 1, 2010 to contest the record check report. The attorney who represented Plaintiff on the charge of exceeding a safe speed in connection with the August 26, 2008 accident sent a letter to Ms. Almquist on February 26, 2010 indicating that, although Plaintiff was accused of operating a vehicle while exceeding a safe speed, this charge was challenged due to rain and weather conditions. As such, a compromise was reached with the State, and the Court entered a Prayer for Judgment in the case, meaning that judgment was not entered against her due to conflicting evidence. *Page 10 
26. Plaintiff was notified in a March 3, 2010 letter from Ms. Almquist that she was terminated. The letter states that, while the correspondence from Plaintiff's attorney, "attempts to explain the accident on August 26, 2008, it does not provide evidence that the motor vehicle report is incorrect. As such you do not satisfy the requirements to continuing [sic] operating a vehicle on company business."
30. After her termination from Defendant-Employer, Plaintiff began drawing unemployment compensation in March 2010. As of the date of the hearing before the Deputy Commissioner, Plaintiff had engaged in a job search as required by the Employment Security Commission but had not been successful in finding a job.
31. Dr. Menard testified, to a high degree of confidence that Plaintiff's ongoing headache condition since the accident was likely a result of the accident. Dr. Menard clarified that his opinion holds true whether Plaintiff hit her head in the accident or not, as post-concussive headaches are often seen in a rapid deceleration-type ("whiplash") injury, in which the brain is essentially shaken inside the skull.
32. Dr. Menard confirmed that Plaintiff may need treatment for several years for her headache condition.
33. Dr. O'Donovan testified that Plaintiff's episodic spells and vision and memory problems are symptoms of a concussion. He further testified that the accident was a very probable cause of the symptoms for which Plaintiff presented to him.
34. Defendants retained neuropsychiatrist Dr. Thomas Gualtieri to review Plaintiff's medical records. He did not examine Plaintiff. Dr. Gualtieri acknowledged that Plaintiff had been in a "serious accident," but maintained that, because the emergency room record did not mention any report of head pain, dizziness or visual changes, he did not believe that Plaintiff had *Page 11 
sustained a concussion. Dr. Gualtieri could not attribute Plaintiff's headaches or other symptoms to the accident.
35. Dr. Gualtieri acknowledged, based on Dr. Maggiore's September 4, 2008 note, that Plaintiff might have had "a little concussion." However, he noted that, with a Grade 1 concussion (in which there is no loss of consciousness or amnesia), there are typically no long-term consequences, such as persistent headaches.
36. The Full Commission accords more weight to the testimony of Drs. Maggiore, Menard and O'Donovan than to that of Dr. Gualtieri as to the causation of Plaintiff's post-accident headaches, "whiteout" spells, vision problems and memory problems. The first three doctors have seen and evaluated Plaintiff several times and were apprised of previous medical records during their depositions, while Dr. Gualtieri did not evaluate Plaintiff.
37. With regard to Plaintiff's blood clots, Dr. Knovich confirmed that Plaintiff's Factor V Leiden condition predisposed her to the development of DVTs, but she also noted that trauma enhanced the clotting potential conferred by the genetic condition and that, in the absence of some provocation such as trauma, most carriers will not develop spontaneous DVTs.
38. Dr. Knovich opined that people who have had one DVT are more likely than the general population to develop a recurrence, even in the absence of additional trauma.
39. Dr. Knovich opined, and the Full Commission finds, that, more likely than not, the accident precipitated a series of events that resulted in Plaintiff's recurring DVTs. Among other factors, she based this opinion on her presumption that the damage to the blood vessel in Plaintiff's right leg sustained in the accident led to her first blood clot.
40. Dr. Knovich recommended that Plaintiff maintain good hydration and avoid overexertion in order to minimize the risk of recurrent DVTs. *Page 12 
41. Dr. Knovich acknowledged that Plaintiff had a pre-accident history of obesity and oral contraceptive use, both of which are risk factors for the development of DVTs. Nonetheless, she maintained her opinion, to a reasonable degree of medical certainty, that the accident and resulting injury to Plaintiff's leg was the most significant causative factor in Plaintiff's development of DVTs.
42. Plaintiff was mildly depressed before the accident and maintained that she had become more depressed and anxious following the accident. However, there is no expert testimony of record to establish that Plaintiff's mental health condition was more likely than not significantly caused or aggravated by the accident and/or its aftermath.
43. Plaintiff continued to have severe headaches as of the date of the hearing before the Deputy Commissioner. She testified that her "whiteouts" had abated with medication.
44. The medical treatment Plaintiff has received for her DVTs, pulmonary emboli and her headaches and related symptoms has been reasonably required to effect a cure, provide relief and/or lessen the period of Plaintiff's disability. Further treatment for said conditions is reasonably required to effect a cure, provide relief and/or lessen the period of Plaintiff's disability.
45. The Full Commission finds that, as the result of her compensable injury by accident, Plaintiff was disabled from any employment from September 4, 2008 through October 29, 2008, from November 15, 2008 through December 14, 2008, and from June 10, 2009 through August 9, 2009.
46. Plaintiff has failed to produce medical evidence that she is incapable of work in any employment due to her work injury following her termination on March 3, 2010. Plaintiff has not been written completely out of work at any time following her termination, nor has she *Page 13 
been assigned work restrictions. In addition, no doctor has opined that Plaintiff is incapable of obtaining employment due to her injury.
47. Plaintiff has failed to produce evidence that she he has, after a reasonable effort, been unsuccessful in obtaining employment due to her injury. When asked whether any potential employers had talked to her about her work injury or why she was out of work, Plaintiff testified that only two employers had asked her about her accident. Plaintiff indicated that she told these employers as little as possible and simply informed them that she was out of work due to the accident. It is not clear from Plaintiff's testimony that she actually informed the employers in question that she had been injured in the accident. Furthermore, Plaintiff indicated that there was only one job that she did not apply for due to her own belief that the job would not be suitable, due to "[her] breathing problems due to the blood clots in [her] lungs." Dr. Knovich opined that Plaintiff should observe "activity precautions" such as good hydration and frequent position changes, although these were not assigned as work restrictions.
48. Plaintiff has failed to produce evidence that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment.
49. Based on her average weekly wage of $367.20, Plaintiff's compensation rate is $244.81.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's DVTs and pulmonary emboli are related to her August 26, 2008 work-related accident and are thus compensable. N.C. Gen. Stat. § 97-2(6). *Page 14 
2. Plaintiff `s headaches and related symptoms ("whiteouts," vision problems and memory problems) are related to her work-related accident and are thus compensable. Id.
3. In order to meet the burden of proving continuing disability, Plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by Plaintiff's injury. Hilliard v.Apex Cabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations.Demery v. Perdue Farms, Inc., supra.
4. As Plaintiff's DVT/pulmonary emboli and headaches and related symptoms are compensable, Plaintiff is entitled to *Page 15 
temporary total disability compensation for the periods before her termination in which she was out of work for said conditions.Id.
5. Plaintiff was out of work from September 4, 2008 through October 29, 2008 and is entitled to temporary total disability compensation for said period. As they have already paid temporary total disability compensation for the entire period from September 4, 2008 through October 31, 2008, Defendants are entitled to credit for two days of overpayment. N.C. Gen. Stat. § 97-42.
6. Plaintiff was out of work from November 15, 2008 through December 14, 2008 and received short-term disability benefits totaling $1,346.40 for the period from November 17, 2008 through December 15, 2008. Defendants owe temporary total disability compensation from November 15, 2008, through December 14, 2008, but are entitled to a full credit for the short-term disability benefit which Plaintiff received from November 17, 2008 through December 15, 2008. Id.
7. Plaintiff was out of work from June 10, 2009 through August 9, 2009 and received short-term disability benefits totaling $1,419.84 for the period from June 10, 2009 through July 12, 2009. Defendants owe temporary total disability compensation at the full rate of $244.81 per week for the period from June 10, 2009 through August 9, 2009, but are entitled to a credit in the amount of $1,419.84 for the short-term disability benefits paid from June 10, 2009 through July 12, 2009. Id.
8. Plaintiff has failed to prove that she was unable to work and earn wages following her termination on March 3, 2010 due to her work injury. Plaintiff has not been written completely out of work at any time following her termination, and no doctor has opined that she in incapable of obtaining employment due to her injury. Although Plaintiff has applied for some jobs, she has failed to show that she was unable to obtain employment due to her work injury. Plaintiff has also failed to show that it was futile for her to seek employment because of other factors. Finally, Plaintiff has not obtained other employment at wages less than her pre-injury wages. N.C. Gen. Stat. § 97-29; Russell v.Lowes Product Distribution, supra. *Page 16 
9. Plaintiff is entitled to have Defendants pay for the treatment she has received for her DVTs, pulmonary emboli and her headaches and related symptoms, including but not limited to diagnostic testing, hospitalizations, surgeries, prescriptions and mileage. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
10. Plaintiff is entitled to have Defendants authorize and pay for further medical treatment for her compensable DVTs, pulmonary emboli and her compensable headaches and related symptoms, including but not limited to diagnostic testing, hospitalizations, surgeries, prescriptions, referrals and mileage. Id.
11. Plaintiff has shown that there is a substantial risk of the necessity of future medical compensation for her compensable DVTs, pulmonary emboli and her headaches and related symptoms, and she is thus entitled to have the limitations period of N.C. Gen. Stat. § 97-25.1 suspended.
12. Plaintiff has not shown, at this time, that her depression and anxiety are compensable.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Defendants shall, subject to the attorney's fee provision below, pay to Plaintiff, in a lump sum, temporary total disability compensation at the rate of $244.81 per week for the periods from November 15, 2008 through December 14, 2008 (less a credit in the amount of $1,346.40 for short term disability benefits paid to Plaintiff), and from June 10, 2009 through *Page 17 
August 9, 2009 (less two days as credit for their earlier temporary total disability overpayment and less a credit in the amount of $1,419.84 for short term disability benefits paid to Plaintiff).
2. As Plaintiff's attorney's fee, Defendants shall deduct 25 percent of the lump sum amount set forth in Paragraph 1 above, after application of the credits, and pay such portion directly to Plaintiff's counsel.
3. Defendants shall pay for the treatment Plaintiff has heretofore received for her DVTs, pulmonary emboli and her headaches and related symptoms, including but not limited to diagnostic testing, hospitalizations, surgeries, prescriptions and mileage. To any extent that Plaintiff and/or any third-party payor has paid for any such treatment, Defendants shall reimburse such payor(s) in full.
4. Defendants shall, without regard to the limitations period of N.C. Gen. Stat. § 97-25.1, authorize and pay for further medical treatment for Plaintiff's compensable DVTs, pulmonary emboli and her compensable headaches and related symptoms, including but not limited to diagnostic testing, hospitalizations, surgeries, prescriptions, referrals and mileage. Dr. Knovich is hereby designated as Plaintiff's treating physician for her DVTs, pulmonary emboli, and Dr. Menard is hereby designated as Plaintiff's treating physician for her headaches and related symptoms.
5. Defendants shall pay the costs. As part of their costs, if they have not done so already, Defendants shall pay expert witness fees to the deponents, the amounts of which were set in Orders previously filed by the Deputy Commissioner.
This the ___ day of September, 2011. *Page 18 
 S/____________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/________________ TAMMY R. NANCE COMMISSIONER
DISSENTING WITHOUT A WRITTEN OPINION:
 S/________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1